MONGAUP VALLEY Co., INC., Plaintiff, *v.* ROCKLAND LIGHT AND POWER COMPANY, Defendant.

Supreme Court, Sullivan County, July 15, 1932.

*Ellsworth Baker* [*Joseph Lorenz* of counsel], for the plaintiff.

*Elton H. Beals* [*Cuddeback & Jones, Breed, Abbott & Morgan* and *John D. Lyons* of counsel], for the defendant.

FOSTER, J. The plaintiff seeks to enjoin the defendant from maintaining an alleged nuisance, which it claims the defendant created in connection with the operation of one of its hydroelectric developments situated on the Mongaup river in Sullivan county, and known as the Swinging Bridge dam and reservoir. It also seeks a money judgment for damages alleged to have been sustained as a result of such nuisance.

The reservoir mentioned extends in a northerly direction from the Swinging Bridge dam to a point near the hamlet of Mongaup Valley, a distance of several miles. Although designed as a combination power and storage reservoir, its primary function is that of storage, and the waters impounded are released, as the occasion requires, to augment the supply contained in reservoirs below.

The plaintiff owns a tract of land, between 3,000 and 4,000 acres

in extent, in the vicinity of the reservoir and on both sides thereof. On the west side such lands do not appear to be contiguous to the reservoir, at least not to any great extent, but on the east side they are immediately adjacent to and extend along the shore line or high-water mark for a considerable distance. For the most part these lands are wild and uncultivated, and suitable only for recreational purposes. On the east side there are several buildings which are inhabited, the most pretentious of which are the lodge and outbuildings erected in 1929, and now occupied by the president of the plaintiff corporation. On the same side, some distance to the north and about one-quarter of a mile from the reservoir, is a district schoolhouse. Apparently the only pupils who attend at this school are children of the plaintiff's employees. In addition to the plaintiff's property on the west side, which has no buildings, there is a summer boarding house owned by one Shapiro which contains about thirty rooms; also two houses owned by Mrs. Simon Stroh, one of which is occupied by her and her husband.

In general the whole territory south of the hamlet of Mongaup Valley for a distance of several miles on both sides of what is now the defendant's reservoir is sparsely settled. It is a section which has been largely devoted to recreational uses, such as hunting and fishing, and several hunting clubs were formerly located in and about these environs. On the east side of the reservoir the plaintiff's property may be reached by a public highway which branches off the main highway a short distance east from Mongaup Valley, and runs southerly along the easterly side of the reservoir, at varying distances therefrom, through the property of the plaintiff and ultimately connects with the highway near Port Jervis. The condition of this road beyond the buildings on the plaintiff's property would not indicate that it was frequently traveled.

The construction of the dam and reservoir was commenced in 1929, and completed in the early part of 1930. The dam was then closed and the waters of the Mongaup river were backed up and impounded over the bed of the reservoir. This flooding continued until July thirtieth of the same year, and thereafter the waters were withdrawn gradually until at about November thirtieth they had been drawn down to the bed of the river. The plaintiff claims that as the waters were withdrawn, and large areas of land previously flooded were uncovered, extremely obnoxious odors emanated from the bed of the reservoir and created a nuisance which materially injured its property. The cause of the odors, according to the plaintiff, was the decomposition of vegetation which had been left on the bed of the reservoir.

On the trial the plaintiff took the position that the defendant's failure to remove vegetation, such as grass, weeds and small bushes,

constituted improper engineering practice and amounted to negligence. The plaintiff does not now abandon this claim, but it does assert, irrespective of the question of negligence, that if obnoxious odors in fact existed to the injury of its property it is entitled to relief as a matter of course.

The defendant urges first, and without regard to the existence of odors on the theory of either negligence or nuisance, that the plaintiff has released it from any claim for damages arising out of the filling of the reservoir or the withdrawal of waters therefrom. This claim is based upon the language of stipulations contained in written instruments by which the plaintiff conveyed certain lands to the defendant, and in which an easement was reserved to the plaintiff; and also upon stipulations contained in the grant of the easement from the defendant to the plaintiff. By deed dated August 10, 1929, the plaintiff conveyed 180 acres of land to the defendant for the sum of $47,500, and in this deed the plaintiff reserved the privileges of boating, bathing, hunting and fishing, etc., over and upon any waters which might thereafter cover said lands, subject to the rights of the defendant to overflow the same and withdraw the waters at any time, or otherwise use the lands for hydroelectric purposes. The exercise of any of these privileges connected with the easement so reserved to the plaintiff is to be at its sole risk and without any liability on the part of the defendant for any personal injuries, for property damage or otherwise, the plaintiff expressly assuming all such liability. On May 6, 1930, the plaintiff executed to the defendant a general release. On the same date it also executed to the defendant another deed, by which it quitclaimed, among others, the same lands as were conveyed by the deed of August 10, 1929. No specific mention is made in this deed of any right on the part of the defendant to withdraw waters, although the same easement to the plaintiff is identified by reference to the previous deed. Again on May 6, 1930, the defendant executed to the plaintiff a written instrument which is a grant of an easement, similar to the easement reserved in the previous deeds, over any part of the premises described therein, the flooding of which was contemplated. This easement was made " subject, however, to the right of the party of the first part, its successors and/or assigns to at any time or times withdraw any or all of said waters from said lands and/or overflow, submerge, or inundate, cover with water, or keep under water at any time or times any or all of said lands or otherwise use or affect the lands herein described and other lands owned by first party for hydroelectric purposes, and without any liability upon the part of the first party, its successors or assigns for any claims or damages by reason of or

in any manner based upon or as a result of the overflowing of said lands with water or the withdrawal therefrom of water."

The plaintiff now contends that the release clauses in these instruments operate merely as a limitation of liability for the possible destruction by the withdrawal of waters from the reservoir of the easement reserved to the plaintiff. This construction seems plausible and reasonable as applied to the deed of August 10, 1929. It is not so plausible as applied to the grant of May 6, 1930, a portion of which has been quoted verbatim. However, I take the view that it was not the intention of the parties to include, and that the stipulations releasing the defendant from liability do not cover, either a claim of negligence or nuisance against the defendant in connection with the preparation of the reservoir bed.

There are very definite reasons, however, why the plaintiff's case must be determined upon the principles of negligence, rather than upon the more simple rules of the law of nuisance. The most impelling reason for this conclusion is the fact that there was and is a privity of estate between the parties. In the absence of such relationship, and assuming the presence of obnoxious odors emanating from defendant's premises, there would be no reason for inquiry as to the cause. The mere proof of their existence would be sufficient to establish liability, and it would not be a good defense to show that such odors resulted despite the careful operation of a lawful trade or business. (*Bohan* v. *Port Jervis Gas-Light Co.*, 122 N. Y. 18.) The situation between these parties is entirely different. As already indicated, the plaintiff not only sold to the defendant the lands to be used for reservoir purposes, but actually retained an interest in such property in the form of an easement over the flooded areas. These factors, coupled with the fact that the Legislature, acting through its duly constituted agencies, has authorized the construction and operation of the reservoir, prevent the application of the principles of nuisance as defined in the *Bohan* case, and it follows that the plaintiff may not justly complain of any consequence resulting from the construction of the reservoir, the flooding thereof, or the withdrawal of waters therefrom, unless negligence is shown. (*Bennett* v. *L. I. R. R. Co.*, 181 N. Y. 431; *Conabeer* v. *N. Y. C. & H. R. R. Co.*, 156 id. 474.) Since the case is to be considered from this viewpoint, it is unnecessary to discuss the defense of statutory sanction.

To succeed upon the theory that it has been injured through the defendant's negligence, the plaintiff had the burden to establish these propositions: *First*, that odors, offensive to a person of ordinary sensibilities, emanated from the bed of the defendant's reser-

voir; *second,* that such odors were caused by a failure on the part of the defendant to prepare the reservoir bed with ordinary skill and care so as to avoid injury to be reasonably anticipated. (*Ferdon* v. *N. Y., O. & W. R. Co.,* 131 App. Div. 380, and cases therein cited.) The testimony as to the existence of odors is exceedingly voluminous and it cannot be discussed here in detail. Any finding with relation to this matter must necessarily depend largely on how one views the credibility of the witnesses, but not entirely so. The physical circumstances furnish an important element of proof. Here was a large tract of land covered with water for a time and then exposed so that a large area of water-soaked soil was laid bare to the rays of the sun. It was inevitable that the withdrawal of waters would cause stagnant pools to form here and there, for it could not be expected that the bed of the reservoir would be so constructed that perfect drainage would result. The ordinary layman, I think, would assume, and common experience would indicate, that under such circumstances the depletion of any pond or reservoir would cause odors of a greater or lesser degree, and more or less objectionable, and without regard to the presence of vegetation. This view is supported by the testimony of some of the plaintiff's experts in which they indicate that the removal of vegetation would merely serve to minimize the odors rather than to entirely eradicate them. After consideration of these circumstances which tend to corroborate the witnesses on this issue, and after due allowance is made for exaggeration on the part of some of the witnesses as to the character of the odors, the evidence is sufficient to sustain a finding that odors, which were offensive to persons of ordinary sensibilities, emanated from the reservoir bed during the period claimed.

However, as to the elements of negligence I think the plaintiff has failed to sustain the burden of proof. Several experts on both sides testified as to the methods used in the preparation of reservoir beds. They differed somewhat with relation to the removal of vegetation, but their testimony taken as a whole clearly indicates that there is no fixed and invariable standard, and that methods are very largely determined by the circumstances of the particular case. The method actually used in the majority of instances cited was to cut the larger growth of wood, and burn the same in piles. By this method a portion of the grass surrounding each pile would be burned off. The defendant followed substantially this method. The plaintiff's insistence that all of the grass ought to have been removed, and that every bush ought to have been cut, is without merit. Even if all the grass had been cut or burned in the fall of 1929, there undoubtedly would have been a new growth over a

considerable portion of the reservoir because the flooding was a gradual process and did not reach its peak until July thirtieth of the following year. In any event, it is difficult to believe that a growth of grass and bushes, not particularly dense and scattered over an open space of considerable size, even though dead and soaked with water, would decompose and give off the odors described within the time alleged. It clearly appears that the slime or scum which formed on the grass and the bushes, the existence of which was considerably stressed by the various witnesses, was due to a growth of microscopic plants known as algea. For the presence of this the defendant, of course, was not responsible, nor does it appear that there was anything it could have done to have checked or retarded such growth. There must also be taken into consideration the fact that the summer of 1930 was a period of extraordinary drought, the driest summer, in fact, in twenty-five years. This undoubtedly intensified whatever condition existed, and indeed, in so far as the proof is concerned, may have been entirely responsible for it. The exercise of reasonable care did not require the defendant to anticipate this condition. A fair consideration of all the evidence with relation to the preparation of the reservoir bed fails to reveal a sufficient basis to support the charge that the defendant was negligent.

It may not be material to discuss the alleged cause of the odors since the charge of negligence has not been sustained, but in view of the fact that the parties have stipulated the testimony in this action to apply to another case, and that such issue is important in both cases, I think it proper to deal briefly with that subject. The plaintiff stood squarely upon the proposition that decomposition of vegetation was the cause of such odors. I do not find that the weight of testimony supports this theory. Only one witness, Dr. Rudolfs, was competent, or had made the necessary investigation, to determine whether decomposition had actually taken place. Other witnesses, although competent to testify as to their observation of reservoir conditions and odors in connection therewith, were not qualified to give testimony of much value as to the cause of odors. Certainly, at least, their testimony cannot be said to establish a preponderance of proof. If decomposition had taken place it is obvious that it would have been general over the area in question and not confined to any one particular place. The witness, Dr. Rudolfs, took several samples in different sections and subjected them to laboratory tests. This, of course, was the only method by which the question of decomposition could be ascertained with any fair degree of certainty. Such tests show that the vegetation had not decayed. This testimony cannot be

rejected except on the grounds that either Dr. Rudolfs was incompetent or else that he committed perjury. There is nothing to warrant the rejection of such evidence on either theory. If decomposition of the vegetation did not take place, then it is plain that odors of the character complained of did not emanate from that source. The testimony on the subject, taken as a whole, indicates that there are other sources from which such odors might have come. In my opinion no one can determine from the testimony in this case with any semblance of certainty the cause of the odors. For the purpose of this action, however, it is unnecessary to speculate as to what might have caused them, since the only reliable testimony offered on the subject indicates that they did not originate from decayed vegetation. On this issue, also, the plaintiff has failed to sustain the burden of proof.

For the reasons indicated the complaint will be dismissed. The matter of costs may be taken up on the presentation of findings. Proposed findings may be submitted within twenty days after the receipt of this memorandum.